UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
NORTHERN DIVISION


FILED
SEP 25 2009

******************************************************************

| | |
|---|---|
| TIM AND CARLA GEFFRE ON BEHALF OF S.G., | CIV 06-1047 |
| Plaintiff, | |
| -vs- | MEMORANDUM OPINION AND ORDER |
| LEOLA SCHOOL DISTRICT 44-2, | |
| Defendant. | |

******************************************************************

The Education of the Handicapped Act, 20 U.S.C. § 1401 et seq. (1975), was enacted to ensure that children with disabilities have access to a free appropriate public education. It authorized federal appropriations to assist state and local agencies in educating handicapped children, conditioning such funding upon a State's compliance with extensive goals and procedures. Pursuant to the 1990 amendments, the Act is now known as the Individuals with Disabilities Education Act ("IDEA" or "Act"). Pub.L. No. 101-476, § 901(a), 104 Stat. 1103, 1142 (1990). The Act was amended again in 1991, 1997, and 2004. Those amendments are applicable here.

The IDEA requires public school districts to provide to children with disabilities a free appropriate public education[1] ("FAPE") designed to meet their unique needs and to prepare them for further education, employment, and independent living. 20 U.S.C. § 1400(d)(1)(A). "The 'free appropriate public education' required by the Act is tailored to the unique needs of the handicapped child by means of an 'individualized educational program' ("IEP")." Board of

---

[1] The term "free appropriate public education" means special education and related services that - - (A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the State educational agency; (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and (D) are provided in conformity with the individualized education program required under 20 U.S.C. § 1414(d). 20 U.S.C. § 1401(9). *See also* 34 C.F.R. § 300.17.

Educ. of Hendrick Hudson Central School Dist., Westchester County v. Rowley, 458 U.S. 176, 181, 102 S. Ct. 3034, 3038, 73 L. Ed. 2d 690 (1982); 20 U.S.C. § 1401(18).

> The IEP, which is prepared at a meeting between a qualified representative of the local educational agency, the child's teacher, the child's parents or guardian, and, where appropriate, the child, consists of a written document containing
> (A) a statement of the present levels of educational performance of such child,
> (B) a statement of annual goals, including short-term instructional objectives,
> (C) a statement of the specific educational services to be provided to such child, and the extent to which such child will be able to participate in regular educational programs,
> (D) the projected date for initiation and anticipated duration of such services, and
> (E) appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved.

Rowley, 458 U.S. at 182, 102 S. Ct. at 3038; 20 U.S.C. § 1401(20). "Local or regional educational agencies must review, and where appropriate revise, each child's IEP at least annually." Rowley, 458 U.S. at 182, 102 S. Ct. at 3038; 20 U.S.C. § 1414(d)(4).

> In addition to the state plan and the IEP already described, the Act imposes extensive procedural requirements upon States receiving federal funds under its provisions. Parents or guardians of handicapped children must be notified of any proposed change in "the identification, evaluation, or educational placement of the child . . . or the provision of a free appropriate public education to such child," and must be permitted to bring a complaint about "any matter relating to" such evaluation and education. [§§ 1415(b)(3) and (6).] Complaints brought by parents or guardians must be resolved at "an impartial due process hearing," and appeal to the state educational agency must be provided if the initial hearing is held at the local or regional level. [§§ 1415(f)(1) and (g).] Thereafter, "[a]ny party aggrieved by the findings and decision" of the state administrative hearing has "the right to bring a civil action with respect to the complaint . . . in any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy." [§ 1415(i)(2).]

Rowley, 458 U.S. at 182-83, 102 S. Ct. at 3038-39.

S.G. is or at least was an individual with a disability pursuant to the IDEA. The Leola School District ("District") denied Carla and Tim Geffre's ("Carla" and "Tim" or collectively "Geffres") requests for an educational placement for S.G. back in the District at the public high school and for transportation reimbursements. The Geffres then requested an administrative hearing to resolve their grievances. The IDEA permits "any party to present a complaint . . . with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." 20 U.S.C. § 1414(b)(6). *See also* 34 C.F.R. § 300.507(a). The hearing was held on September 25 and October 16, 2006. The hearing examiner issued her decision on November 17, 2006, partially denying the requests of the Geffres. Geffres instituted this appeal pursuant to 20 U.S.C. §§ 1415(i)(2)(A) and (3)(A). The parties agreed to supplement the record with documentary evidence generated since the date of the administrative hearing. *See* 20 U.S.C. § 1415(i)(2)(C)(ii).

The hearing examiner, a lawyer, framed the issues as (1) whether the District provided a FAPE in the least restrictive environment ("LRE") to S.G.; (2) whether the parents are entitled to mileage reimbursement for transporting S.G. to Dakota School[2] in Aberdeen, South Dakota, from Leola[3], South Dakota, in the amount of $409.60, together with reimbursement for their time, reasonable attorney's fees and costs, and prejudgment interest. The hearing examiner determined that the District did offer S.G. a FAPE in the LRE, namely placement at Dakota School and that

---

[2] Dakota School is the educational component of Northeastern Mental Health Center's Dakota House, a residential treatment facility, and is a certified special education school. Children are referred to Dakota House by the South Dakota Department of Social Services and Corrections or by the individual school districts. Dakota School staff specializes in working with students who have a variety of behavioral problems, which make educating them in a mainstream educational setting very difficult, and are trained in different intervention techniques, from counseling to formal behavioral interventions.

[3] Leola is approximately 40 miles Northwest of Aberdeen, South Dakota.

3

the parents are entitled to $409.60 for mileage reimbursement, reasonable attorney fees,[4] costs, and prejudgement interest.

Geffres filed a timely appeal to this court of the hearing officer's decision. The United States Court of Appeals for the Eighth Circuit set forth the standard of review applicable in this proceeding in <u>Blackmon v. Springfield R-XII School District</u>, 198 F.3d 648, 654-55 (8th Cir. 1999):

> The IDEA permits aggrieved parties to seek review of an administrative hearing panel's decision by bringing a civil action in federal district court. *See* 20 U.S.C. § 1415(i)(2)(A). On review, the district court must take into consideration not only the records of the administrative proceedings, but also any additional evidence submitted by the parties. *See* 20 U.S.C. § 1415(i)(2)(B). While the district court should make an independent determination of the issues based on a "preponderance of the evidence," 20 U.S.C. § 1415(i)(2)(B)(iii), the Supreme Court has emphasized that the district court must afford the administrative proceedings "due weight." *Board of Educ. v. Rowley*, 458 U.S. 176, 206, 102 S. Ct. 3034, 73 L. Ed. 2d 690 (1982). The district court's standard of review is less deferential than that applied under the substantial evidence test that courts ordinarily apply in federal administrative law cases, however, a district court must give consideration "to the fact that the state hearing panel has had the opportunity to observe the demeanor of the witnesses." *Fort Zumwalt Sch. Dist. v. Clynes*, 119 F.3d 607, 610 (8th Cir. 1997), *cert. denied*, 523 U.S. 1137, 118 S. Ct. 1840, 140 L. Ed. 2d 1090 (1998). Moreover, courts may not "substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206, 102 S. Ct. 3034. This is because, as the *Rowley* court admonished, "courts lack the 'specialized knowledge and experience' necessary to resolve 'persistent and difficult questions of educational policy.'" 458 U.S. at 208, 102 S. Ct. 3034 (quoting *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 42, 93 S. Ct. 1278, 36 L. Ed. 2d 16 (1973)); *see also E.S. v. Independent Sch. Dist., No. 196*, 135 F.3d 566, 569 (8th Cir. 1998) (stating that judicial review under the IDEA is limited because "judges are not trained educators").
>
> Whether a school district's IEP complies with the requirements of the IDEA is a mixed question of fact and law. *See E.S.*, 135 F.3d at 569. On

---

[4] Hearing officers do not have authority to award attorney fees. The court, however, in its discretion may award reasonable attorney fees. *See* 34 C.F.R. § 300.517(a). Geffres are seeking reasonable attorney fees consistent with the hearing officer's determination.

appeal the standard of review of the district court's ultimate decision is *de novo*. *See id.*; *Fort Zumwalt*, 119 F.3d at 611. In the absence of a mistake of law, we review the district court's determination for clear error. *See E.S.*, 135 F.3d at 569.

"On appeal, the party challenging the outcome of state administrative hearings has the burden of proof." E.S. v. Independent School Dist., No. 196 Rosemount-Apple Valley, 135 F.3d 566, 569 (8th Cir. 1998). The burden is allocated to the party bringing the action challenging the state administrative decision as this comports to the "requirement of deference to the state agencies." Spielberg v. Henrico County Pub. Schs., 853 F.2d 256, 48 Educ. L. R. 352 (4th Cir. 1988), *cert. denied*, 489 U.S. 1016, 109 S. Ct. 1131, 103 L. Ed. 2d 192 (1989).

As previously noted, the hearing was bifurcated to allow more time for testimony. Tim and Carla Geffre each testified at the hearing and were present for the entire proceedings. South Dakota Advocacy Services represented the parents at the hearing and at various times when S.G.'s procedural and substantive IDEA rights were implicated. Testifying in person (on behalf of the parents) from the Dakota House School and Northeastern Mental Health Center were: (1) Duane Kavanaugh; (2) Brain Dannen; and (3) Jessica Glodrey. Testifying in person on behalf of the District were: (1) former Superintendent Bobby Olson; (2) Current Superintendent Jamie Herman; (3) School Board Member Darci Wolff; (4) Mark Gulseth; (5) Dwain Schwan; and (6) Michael Schmitz. Additionally, Court Services Officer Rodney Simon testified via video conference. After the hearing, both parties submitted briefs.

With these rules in mind, the Court has reviewed the administrative record and will set forth the facts which are not in dispute.

I. FACTUAL BACKGROUND

S.G. was born on June 27, 1990. In third grade, he was diagnosed with Attention Deficit Hyperactivity Disorder[5] ("ADHD"), making him eligible for special education services. He was placed on an IEP. Later, but at some time prior to 2004, S.G. received an

---

[5] ADHD is a disorder characterized by "a persistent pattern of inattention and/or hyperactivity-impulsivity that is more frequently displayed and more severe than is typically observed in individuals at a comparable level of development." Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision (American Psychiatric Association, 2000) (hereinafter DSM-IV-TR), 85.

5

additional diagnosis of Oppositional Defiant Disorder[6] ("ODD"). S.G. remained on an IEP until the later part of the 2004-2005 school year, when his family moved him from Aberdeen, South Dakota, into the Leola School District[7]. On February 22, 2005, an IEP meeting was held at the Northeastern Mental Health Center, in Aberdeen, South Dakota. In attendance at this meeting were: (1) the parents; (2) S.G.; (3) Leola School District Superintendent/CEO Bobby Olson ("Olson"); (4) Aberdeen Central High School staff; and (5) Dakota School staff. During this meeting, Aberdeen Central staff expressed concerns about removing S.G. from an IEP. Despite these concerns, the parents decided to discontinue the IEP for S.G. prior to his February 25, 2005, enrollment at Leola High School.

S.G. had some history of behavioral issues, both before and after he enrolled at Leola High School. At the time of his enrollment, S.G. was on probation with the state court system for a juvenile adjudication. Additionally, prior to the events on May 18, 2005, the District documented[8] two incidents of swearing and another occurrence where S.G. made a racially derogatory remark[9]. On May 18, 2005, events occurred that led to a change in S.G.'s educational placement. Sometime during the beginning of S.G.'s fifth period math class, he

---

[6] Oppositional Defiant Disorder is characterized by "a recurrent pattern of negativistic, defiant, disobedient, and hostile behavior toward authority figures that persists for at least 6 months . . . and is characterized by the frequent occurrence of at least four of the following behaviors: losing temper, arguing with adults, actively defying or refusing to comply with the requests or rules of adults, deliberately doing things that will annoy other people, blaming others for his or her own mistakes or misbehaviors, being touchy or easily annoyed by others, being angry and resentful, or being spiteful and vindictive." DSM-IV-TR at 100.

[7] The Leola School District 44-2 is a school district covering approximately 597 square miles and had a total enrollment of approximately 249 students in its PK-12 program. Additionally, the majority of the district's PK-12 students are educated at the same location.

[8] The documentation of these events; however, did not occur contemporaneously with the incidences. The March 8 and 9, 2005, swearing incidents were not documented until March 23, 2005. The documentation of the derogatory remark, which occurred on April 27, 2005, did not occur until May 18, 2005.

[9] S.G. reportedly stated to others that he believed a law exists authorizing persons to shoot Indians if they cross the Missouri River.

got into an argument with some older students. After this argument, S.G. went to the blackboard and wrote "R.I.P. 4/20/98." When Mr. Gulseth, S.G.'s math teacher, asked S.G. what this meant, he reportedly told Gulseth that it was the date of the Columbine tragedy. S.G. also reportedly commented, "it was cool that they shot up the whole school like they did" and that he was going to go to Aberdeen and get a paint ball gun. Gulseth then took S.G. into the hallway and told him, "you can't joke about things like this nowadays in school." Gulseth and S.G. returned to the classroom. Gulseth testified about another discussion with S.G. sometime later in the classroom pertaining to an argument with other children, where he told S.G., "that they were trying to egg him on to get him in trouble and that he needs to let it go."

After school on that same day, May 18, S.G. got into a verbal altercation in the parking lot of the Leola School. Olson testified that, during this incident, he observed S.G. chase another student back into the school. Olson stood in front of the school door to prevent S.G. from entering and S.G. bumped Olson with his shoulder but did not enter the building.

On August 15, 2005, the Leola School Board suspended S.G. for 30 days. In a letter to Tim and Carla dated August 29, 2005, Olson told Geffres that, "[a]t the September 12th board meeting permanent expulsion will be considered." On September 9, 2005, Tim and Carla Geffre requested that S.G. be evaluated for special education needs and related services.

S.G. began attending school at Dakota School on September 20, 2005, and on September 28, 2005, an IEP was developed wherein S.G. would receive his education for the 2005-2006 school year at Dakota School.[10] On October 20, 2005, one month after S.G. began receiving his education at Dakota School, a "Dakota House 30-Day Assessment" on S.G. was completed. This assessment stated that S.G.'s behavior had markedly improved, that Dakota School did not appear to be the least restrictive environment, and that a transition plan would need to be developed. The 30-Day assessment recommended that S.G. continue to receive his

---

[10] As a matter of special education law, S.G.'s IEP, which changed his placement from Leola to Dakota School, should have been amended prior to S.G. attending Dakota School, not after.

7

education at Dakota School for the remainder of the 2005-2006 school year in order to continue to develop skills to transition him back into the least restrictive environment.

In the spring of 2006, Geffres and the District began discussing a transition plan for S.G. where he would transition back from Dakota School into the Leola School District. Before the District would approve S.G. returning to Leola to continue his studies, it required S.G. to complete a psychological evaluation. On May 23, 2006, Stephan Langenfeld, a licensed psychologist, conducted a psychological evaluation of S.G. and determined that he had made significant behavioral progress while at Dakota School. Langenfeld noted, however, that if S.G. were to return to the "regular" classroom setting, ongoing counseling may be necessary to address the behavioral issues as to S.G..

On July 25, 2006, and again on July 31, 2006, IEP meetings were held where Geffres and the District addressed a transition plan for transitioning S.G. back into the Leola School District. The Geffres' proposal was to have S.G. begin the 2006-2007 school year with S.G. enrolled at Leola only for 7th hour, the last class period of the day. Throughout the fall of 2006, S.G. would receive an increasing amount of educational time at Leola, and, by January 2007, he would be fully integrated back into the Leola School District. The District, on the other hand, proposed a transition plan that would have integrated S.G. back into the District at a much slower pace.

The plan the District proposed called for S.G. to be integrated into the Leola School District beginning with the 7th period class. However, by the end of the 2006-2007 year, the "Leola plan" called for S.G.'s attendance in only the 4th, 5th, 6th, and 7th periods. Thus, the proposal of Geffres called for S.G.'s full integration at Leola by January 2007, whereas the District's proposal would only have S.G. attending school in Leola for half the day by the end of the 2006-2007 school year. At the end of the 2006-2007 school year, the District would then conduct another meeting to consider S.G.'s full integration into Leola for the 2007-2008 school year.

On October 16, 2006, the second day of the administrative hearing, the District's attorney advised the hearing examiner that the District was withdrawing its transition proposal altogether based on allegations that S.G. engaged in disrespectful and unsportsmanlike

conduct at a high school football game a few days prior to the October 16 hearing. Such an inconsistent approach complicated the case for plaintiffs and their attorneys and will be factored into the request for attorney fees. The record does not address where S.G. received his education during the 2007-2008 school year, but Geffres' attorney indicated that S.G. continued to receive his education at Dakota School until he graduated from Leola in May 2008.

## II. OBLIGATION TO PROVIDE A FAPE

Under IDEA, a FAPE is an educational program "specifically designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child to benefit from the instruction." Board of Educ. of Murphysboro Community Unit Sch. Dist. No. 186 v. Illinois State Bd. of Educ., 41 F.3d 1162 (7th Cir. 1994) (quotations omitted).

It is well-settled that an appropriate public education does not require what is the absolutely best education or any "potential maximizing" of the educational benefit for the disabled child. Gregory K. v. Longview School Dist., 811 F.2d 1307, 1314 (9th Cir. 1987). Rather, the program provided by the school district need only be "reasonably calculated to enable the child to receive educational benefits." Hendrick Hudson Dist. Bd. of Ed. v. Rowley, 458 U.S. at 207, 102 S. Ct. at 3051.

Here, S.G. was given educational instruction at Dakota School rather than at the Leola High School after a change in his IEP. Thus, it is undisputed that the District did provide S.G. educational instruction. However, the IDEA requires a school district to do more than simply provide educational instruction. In addition to the statutory presumption, IDEA's implementing regulations provide that disabled children are to be educated in the least restrictive environment ("LRE"). 34 C.F.R. § 300.550(b)(1). Therefore, a school district must also provide that instruction in the least restrictive environment, which means the disabled student is to be educated with nondisabled students to the "maximum extent appropriate." Pachl v. Seagren, 453 F.3d 1064, 1067 (8th Cir. 2006) (*citing* 20 U.S.C. § 1412(a)(5)). Consequently, "a disabled student should be separated from his peers only if the services that make segregated placement superior cannot 'be feasibly provided in a

nonsegregated setting.'" *Id.* (quoting Roncker v. Walter, 700 F.2d 1058, 1063 (6th Cir. 1983)); *see also* T.F. v. Special Sch. Dist. of St. Louis County, 449 F.3d 816, 820 (8th Cir. 2006) (noting IDEA reflects a "strong preference" that disabled children attend regular classes with nondisabled children and a presumption in favor of public school placement).

The question then becomes: was Dakota School the least restrictive environment for S.G. during the 2006-2007 school year? The parents argue that Dakota School was not the appropriate placement because it did not provide the opportunity for S.G. to be educated with non-handicapped peers, a statutory preference under the IDEA. *See* Rowley, 458 U.S. at 202, 102 S.Ct. at 3048-49. The District argues and the hearing examiner determined that the District did provide S.G. with a FAPE in the LRE by having his education completed at Dakota School. Pursuant to 20 USC §1415(i)(2)(C), the court is required to consider the record of the administrative proceedings, hear additional evidence at the request of either party, and then base its decision on the preponderance of the evidence.

I find, and conclude, based on a preponderance of the evidence, that S.G.'s education at Dakota School during the 2006-2007 school year was not a FAPE in the LRE.

The plain language of 20 U.S.C. §1412(5)(B) provides in pertinent part: [T]o the maximum extent appropriate, children with disabilities . . . [must be] educated with children who are not disabled, and . . . special classes, separate schooling or other removal of children with disabilities from the regular educational environment [shall occur] only when the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily. The District justifies its position by claiming S.G. could not be mainstreamed because he is a "violent, threatening, disruptive student." The District supports this claim, in part, by attaching to its brief three newspaper articles, wholly unrelated to this case, from the Aberdeen American News discussing school violence. It is fairly debatable whether the Aberdeen American News, or any other news media, can be cited as persuasive authority for anything. It certainly is not persuasive here.

The Eighth Circuit explains that the mainstreaming requirement "is inapplicable where education in a mainstream environment 'cannot be achieved satisfactorily.'" Pachl, 453 F.3d

10

at 1068. Segregating a child from the mainstream setting is allowed when "'the handicapped child would not benefit from mainstreaming' when 'any marginal benefits received from mainstreaming are far outweighed by the benefits gained from services which could not feasibly be provided in the non-segregated setting,' and when 'the handicapped child is a disruptive force in the non-segregated setting.'" *Id.* (quoting Roncker, 700 F .2d at 1063).

There is no question that the genesis of the change in S.G.'s placement to Dakota School was his inappropriate behavior while at Leola. It was imperative, then, that S.G.'s behavior during the time he was being educated at Dakota School be looked at in deciding whether he was ready to transition back to Leola to determine whether he would be a "disruptive force in the non-segregated setting." The District and the hearing examiner failed to do this. The District failed to prove and failed to present any credible evidence that S.G.'s return to school at Leola would pose a substantial risk of injury to himself or others, which is critical in order for the District's position to fall within the exception to the IDEA's mainstreaming requirement. No evidence was presented that any teachers at Leola were concerned that S.G. posed a substantial risk of injury either while at Leola in 2005 or in considering the proposed return to the District in 2006. Mark Gulseth, the one teacher from the District who did testify, testified as to the incident that occurred on May 18, 2005, but he failed to indicate whether he or any other teachers thought S.G. posed a substantial risk of injuring himself or other students.

It is not enough for the District to argue that, because S.G. was a difficult student before, he was, therefore, likely to be a difficult student in the future. This is especially true in light of the fact that the individuals who educated S.G. at Dakota School after May 2005 testified that S.G. had matured to the point where they thought he could successfully be mainstreamed back into Leola. If anybody ought to know that students mature, change, and develop throughout their educational career, it would be educators. Here, however, the District summarily dismissed the recommendations of Kavanaugh, Glodrey, and Dannen. They failed to even give S.G. a chance.

At the administrative hearing, three individuals who had extensive one-on-one contact with S.G. testified as to his behavioral progress. Duane Kavanaugh, the Clinical Director at

Dakota House, testified that while at Dakota School during the 2005-2006 school year, S.G. made significant behavioral changes, which included S.G. acting as a mentor to younger students by helping the teachers at Dakota School. Jessica Glodrey, S.G.'s classroom teacher while he was at Dakota School, also testified that S.G. had taken initiative to become a mentor to other students while enrolled as a student at Dakota School. Glodrey also testified that S.G. had no behavior problems while at Dakota School. Brian Dannen, who is a Licenced Professional Counselor, and was also S.G.'s counselor for over five years prior to the administrative hearing in September 2006 also testified that S.G.'s behavior had changed, which he attributed to maturing, proper medications, and the probation S.G. was on through the state court system.

The evidence is clear that the behavior of S.G. substantially changed for the better while at Dakota School. The hearing examiner should have considered this more heavily in light of the IDEA's requirements that students like S.G. should be mainstreamed with other students. She did not. There is no question that the evidence revealed S.G. had behavioral issues in the past. However, there can also be no question that S.G. made significant behavioral changes while at Dakota School. The hearing examiner failed to adequately consider these undisputed facts, which is critical in determining whether S.G. was afforded a FAPE in the LRE.

The District also failed to consider what supplementary aids and services could be provided to S.G. to enable him to be educated at Leola. The District made no good-faith effort to negotiate with the Geffre's regarding S.G.'s return to the District. The District presented its transition plan to the Geffre's, and an email from Olson stated, "[e]verybody I have spoken to has been very clear that we are not moving from our position." (Exhibit 28) It is clear that the District was going to have it its way or no way at all. This is troublesome in light of the IDEA's presumption that a disabled student should, when possible, be mainstreamed back into the "regular" classroom.

Additionally, Kavanaugh, Glodrey, and Dannen all testified that S.G. could be educated in a "regular" classroom if the necessary support and training was given to the District. Morever, Kavanaugh testified that Dakota School staff had offered to provide in-

service training to District staff dealing with students who have or had behavioral issues like S.G.. The District refused those offers. Such refusal is in direct conflict with the IDEA. "If the school has given no serious consideration to including the child in a regular class with such supplementary aids and services and to modifying the regular curriculum to accommodate the child, then it has most likely violated the Act's mainstreaming directive." Oberti by Oberti v. Board of Educ. of Borough of Clementon School Dist., 995 F.2d 1204, 1216 (3rd Cir.1993)

Additionally, the District argues that, because S.G. made progress at Dakota School, such was the alternative placement best suited for his needs. The District supports this proposition by noting that the initial IEP indicated that Dakota School was the proper placement for him. What the *initial* IEP indicated is not determinative. The District was obligated to consider S.G.'s behavior, grades, and progress while at Dakota School in developing a transition plan for S.G.. It failed to do so.

S.G. was a difficult student in the past, and the District was rightfully concerned with the statements he made regarding Columbine. However, as the recipient of federal funds, the District had an obligation, under the IDEA, to educate students like S.G. in the least restrictive environment, which includes making a good-faith effort at integrating S.G. back into the District. The District failed to do this and, instead, chose to isolate S.G. at Dakota School in violation of the requirements set out in the IDEA.

Giving due weight to the hearing examiner's findings, the court finds, by a preponderance of the evidence, that the hearing examiner failed to adequately consider the evidence presented at the administrative hearing regarding whether Leola would afford S.G. a FAPE in the LRE.

### III. TRANSPORTATION REIMBURSEMENT

Under the IDEA, a Federal Court has the power to "grant such relief as [it] determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii). As a result, "'equitable considerations are relevant in fashioning relief' and the court enjoys 'broad discretion' in so doing." Florence County School Dist. Four v. Carter, 510 U.S. 7, 16, 114 S. Ct. 361, 366 (1993), (*quoting* Burlington School Comm. v. Mass. Dept. of Ed., 471 U.S. 359, 374, 369, 105 S. Ct. 1996,

13

2004-05, 2002, 85 L. Ed. 2d 385 (1985)). In Burlington, the Supreme Court explained that the reviewing Court had broad discretion in fashioning relief which was "appropriate in light of the purpose of the Act." Burlington School Committee, *supra* at 369, 105 S. Ct. at 2002. Not surprisingly, appropriate relief is that relief which is designed to ensure that the student is appropriately educated within the meaning of the IDEA. Parents of Student W. v. Puyallup School District No. 3, 31 F.3d 1489, 1497 (9th Cir. 1994).

The IDEA defines a "free appropriate public education" to include "both instruction, which must be specially designed to suit the needs of the disabled child, *see* 20 U.S.C. § 1401(9), and 'related services,' including 'transportation . . . and other supportive services . . . as may be required to assist a child with a disability to benefit from special education.'" Independent School District No. 284 v. A.C., 258 F.3d 769, 773 (8th Cir. 2001). The IDEA states that related services are to be provided without charge. 20 U.S.C. § 1401(8)(A). In order to be entitled to a related service, it is necessary to establish that: (1) the child is disabled for purposes of IDEA; (2) a related service is involved; (3) the related service is designed to meet the unique needs of the child caused by the disability; and (4) the school district must be responsible under IDEA and its regulations for providing the related services under the particular circumstances of the case at hand. McNair v. Oak Hills Local Sch. Dist., 872 F.2d 153, 156, 52 Educ. L. R. 950 (6th Cir. 1989). *See also* Fick ex rel. Fick v. Sioux Falls School Dist. 49-5, 337 F.3d 968, 970 (8th Cir. 2003).

Reimbursing parents for the time and services necessary for their child, when there has been an IDEA violation, is not uncommon. Bucks County Dept. of Mental Health/Mental Retardation v. Pennsylvania, 379 F.3d 61, 69 (3d Cir. 2004). Courts have consistently awarded reimbursement under the IDEA when a district fails to provide appropriate services. Rapid City School District v. Vahle, 733 F.Supp. 1364 (D.S.D. 1990), *aff'd,* 922 F.2d 476 (8th Cir. 1990); Malehorn on Behalf of Malehorn v. Hill City School Dist., 987 F.Supp. 772, 780 (D.S.D. 1997) (holding that the parents were entitled to reimbursement for the transportation they provided until the new IEP came into effect); Moubry v. Independent School Dist. 696, Ely, Minn., 9 F.Supp.2d 1086, 1107 (D.Minn. 1998) (if the parents incurred expenses in transporting the plaintiff to school, when a proper IEP would have provided free

transportation directly to and from his home, the IDEA would authorize an award of transportation expenses). This reimbursement can encompass an award for both time and services. Hurry v. Jones, 734 F.2d 879, 883-884 (1st Cir. 1984) (plaintiff's father was entitled not only to reimbursement for the weekly transportation costs he incurred, but also to "compensation for the expenditure of time and effort" for delivering the services that the state should have provided). *See also* Bucks County Dept. of Mental Health/Mental Retardation v. Pennsylvania, 379 F.3d 61, 69-70 (3d Cir. 2004) (reimbursement to mother at the rate of $22 per hour for 40 hours per week of training for the time spent working with her disabled daughter after county refused to provide the specific therapy program parent requested was not unreasonable under the IDEA).

The parents are requesting the District to reimburse them $820 as the value of their time in transporting S.G. between Leola and Aberdeen. The hearing examiner found that the Geffre's "provided no evidence on the issue of reimbursement for their time. There is nothing in the record in terms of evidence on the value of their time." (Decision 7). The parents did not submit a bill to the District requesting reimbursement for their time. The only bill the parents submitted was a bill requesting reimbursement for the milage in transporting S.G. from Leola to Aberdeen. (Exhibit 13). No request was ever presented to the District seeking reimbursement for the time spent by the parents in transporting S.G.. It was not until after the District hired an individual to transport S.G. at $20 per trip that the parents sought reimbursement for their time. Therefore, this court affirms the hearing examiner's finding on the issue of reimbursement for the Geffres' time.

## VI. ATTORNEYS FEES

Counsel for plaintiffs has filed an affidavit of attorney's fees and billing statement for the administrative hearing (Doc. 24) and this pending federal case as of August 1, 2007 (Doc. 25). The District has filed an objection to the claim for attorney's fees (Doc. 27). Counsel for plaintiffs then filed a response to the District's objections (Doc. 28). The plaintiffs seek to recover $27,125 in attorney's fees and $743.84 in costs for the work done at the administrative hearing level and $23,581.25 in attorney's fees and $458.58 in costs for the

work in this appeal. Thus, plaintiffs are seeking a total of $51,908.67 in attorney's fees and costs related to this case.

Pursuant to 20 U.S.C. § 1415(i)(3)(B), this court is authorized to "award reasonable attorneys' fees as part of the costs to the parents of a child with a disability who is the prevailing party." "A litigant is a 'prevailing party' if he obtains 'actual relief on the merits of his claim [that] materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." Birmingham v. Omaha School Dist., 298 F.3d 731, 734 (8th Cir. 2002) (*quoting* Farrar v. Hobby, 506 U.S. 103, 111-12, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992)). Attorneys' fees under IDEA "should ordinarily be awarded to the prevailing party unless special circumstances exist to make an award unjust" based upon special findings. Borengasser v. Arkansas State Bd. of Educ., 996 F.2d 196, 199, 84 Educ. L. R. 35 (8th Cir. 1993).

Under IDEA, attorney fees must not only be reasonable, but are to be "based on rates prevailing in the community in which the action or proceeding arose for the kind and quality of services furnished" and with "[n]o bonus or multiplier" in calculating the fees. 20 U.S.C. §§ 1415(i)(3)(B)(i) and (C). The IDEA prohibits an award of attorney fees for services subsequent to the time of a written offer of settlement if "the court or administrative hearing officer finds that the relief finally obtained by the parents is not more favorable to the parents than the offer of settlement." 20 C.F.R. 1415(i)(3)(D)(i)(III). The fact that S.G. was represented by South Dakota Advocacy Services, publicly funded counsel, does not affect his right to fees. Yankton School Dist. v. Schramm, 93 F.3d 1369, 1377 (8th Cir. 1996).

The United States Supreme Court established the framework for awarding statutory attorney fees in Hensley v. Eckerhart, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). The standards for analyzing fee awards under the various federal fee shifting statutes are the same. Therefore, the cases discussing those standards are generally applicable in all such cases. Hensley v. Eckerhart, 461 U.S. at 433 n. 7, 103 S.Ct. at 1939 n. 7; Pedigo v. P.A.M. Transport, 98 F.3d 396, 397 (8th Cir. 1996). "The starting point in determining attorney fees is the lodestar, which is calculated by multiplying the number of hours reasonably expended

by the reasonable hourly rates." Fish v. St. Cloud State University, 295 F.3d 849, 851 (8th Cir. 2002) (citing Hensley v. Eckerhart, 461 U.S. at 433, 103 S.Ct. at 1939). Ordinarily, the court is required to consider the following twelve factors in arriving at the lodestar:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

Hensley v. Eckerhart, 461 U.S. 429-30 n. 3, 103 S.Ct. 1937 n. 3.

Defendants do not dispute the reasonableness of the hourly rates requested. Defendants have disputed certain itemized hours and costs. I will examine the twelve factors set forth in Hensley. Obviously, the time and labor required are the most important factors. As Abraham Lincoln observed long ago, an attorney's time and advice are the attorney's "stock in trade." I do not find that the questions involved in this case are particularly novel or difficult. Likewise, I do not find that any advanced skill would be involved in performing the legal services in this case. There was no preclusion of employment by plaintiffs' attorneys due to acceptance of the case. This is a non-factor. There is no evidence as to a customary fee in this type case. The fee would have been contingent upon success. It was not fixed and plaintiffs' attorneys had no guarantee of being paid at all. There were no time limitations imposed by the client or the circumstances of the case. A very small amount of money was involved. The results obtained were very much mixed. The child graduated from high school before the case could be concluded. Any request for a different placement became moot. The experience, reputation, and ability of the attorneys would certainly be good. There was nothing "undesirable" about this case. There was no relationship between the plaintiffs and the attorneys such as would be material. The only evidence submitted regarding "awards" in similar cases was Yankton School District v. Schramm, 900 F.Supp 1182 (D.S.D. 1995).

In Schramm, counsel for the parents - the same counsel as in the current case - was awarded $7,633.71 in attorney fees. Such a comparison, however, does not paint an entirely

accurate picture, especially in highly fact-intensive cases such as this. For example, Schramm was decided in 1995 when counsel for the parents charged an hourly rate of $75.00. In 2000, the rate for counsel for Geffres increased to $175 per hour. This is an increase of 133%. Additionally, Schramm involved a one-day hearing with two witnesses and 200 pages of transcript testimony. Here, the administrative hearing was two days, involved eleven witnesses, and contained nearly 600 pages of transcript testimony.

Turning now to the hours reasonably expended, I must determine what hours were reasonably expended in this litigation in order to calculate the lodestar. Hensley v. Eckerhart, 461 U.S. at 433, 103 S.Ct. at 1939. I am authorized to reduce an award if the hours were not reasonably expended. DeGidio v. Pung, 920 F.2d 525, 533 (8th Cir. 1990). I believe the fees sought in this case are excessive. Counsel for Geffres spent over 77 hours working on briefs at the administrative hearing level. On appeal to this court, counsel for Geffres spent over 65 hours working on a 40-page brief, and another 45 hours on a 25-page reply brief. The amount of time spent on such matters appears excessive, especially in light of the fact that counsel for Geffres focuses his practice on representing students with disabilities who pursue their right to a free appropriate education.

## CONCLUSION

School districts are required to address behavioral issues in the IEP to the extent that such issues affect the child's ability to receive educational benefits pursuant to the other portions of the IEP.

This matter has taken me too long to decide. However, the parties themselves have allowed this case to languish. It is the obligation of parties to move a case forward. I can say, however, that the delay has allowed me to review more recent IDEA cases which have shed light on issues in this case. The law is clear to me that the District did not provide S.G. with a free appropriate public education in the least restrictive environment and that the District should be required to provide reimbursement to the plaintiffs for part of the expenses incurred in transporting S.G. to Dakota School and in pursuing this matter. It is also clear that reasonable attorney fees should be awarded.

## ORDER

IT IS ORDERED that the decision of the hearing examiner is reversed as to the issue of a free appropriate public education in the least restrictive environment, affirmed on the issue of reimbursement for the parents' time, and affirmed in part on the issue of attorney's fees and costs.

IT IS FURTHER ORDERED that plaintiffs are awarded attorneys fees in the amount of $2,800 for time spent in the hearing and $18,700 for research and briefing for a total of $21,500.

IT IS FURTHER ORDERED that costs shall be assessed in favor of plaintiffs in the amount of $1,202.42.

Dated this 24th day of September, 2009.

BY THE COURT:

CHARLES B. KORNMANN
United States District Judge

ATTEST:

JOSEPH HAAS, CLERK

BY: Barbara Voegele
DEPUTY
(SEAL)